# UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WALSH CONSTRUCTION COMPANY, | |
| Plaintiff, | |
| v. | No. |
| LEXINGTON INSURANCE COMPANY, RSUI INDEMNITY COMPANY, and DEMTECH, LLC, | |
| Defendants. | |

## DECLARATORY JUDGMENT COMPLAINT AND OTHER RELIEF

NOW COMES the Plaintiff, WALSH CONSTRUCTION COMPANY ("Walsh"), by and through its attorneys, Francis A. Shannon, III and Shannon Law Associates, Inc., and for its Declaratory Judgment Complaint and other relief against the Defendants, LEXINGTON INSURANCE COMPANY ("Lexington"), RSUI INDEMNITY COMPANY ("RSUI"), and DEMTECH, LLC ("Demtech"), pursuant to 28 U.S.C. §§2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, state as follows:

## INTRODUCTION

1.      This is an action for declaratory judgment and other relief pursuant to 28 U.S.C. §§2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.  Plaintiff Walsh seeks a declaration that Defendants Lexington and RSUI are obligated in accordance with their respective insurance policies to indemnify Walsh for the costs and expenses it expended to rebuild and repair property damage done to bridge support piers when Demtech improperly performed a controlled demolition of the Long Island Bridge that previously connected Long Island and Moon Island in Boston Harbor.  Walsh also seeks a ruling that Lexington has breached its contract by denying coverage to Walsh as an additional insured under Demtech's commercial general liability

insurance policy; and that Lexington has violated G.L. c.176D, §3(9) of the "Massachusetts Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance".

## THE PARTIES

2.     Walsh is an Illinois corporation authorized to conduct business in the Commonwealth of Massachusetts with a principal place of business at 929 West Adams Street, Chicago, Illinois.

3.     Lexington is an insurance company organized and existing under the laws of Delaware with its principal place of business at 99 High St., Floor 24, Boston, Massachusetts.

4.     RSUI is an insurance company organized under New Hampshire law with its principal place of business at 945 East Paces Ferry Road NE, Suite 1800, Atlanta, Georgia.

5.     Demtech is a Pennsylvania limited liability company authorized to conduct business in the Commonwealth of Massachusetts with a principal place of business at 470 Dutchtown Road, Butler, Pennsylvania.  Demtech has been added as a party defendant to this action such that it will be bound by the coverage declarations to issue from this Court.

## JURISDICTION AND VENUE

6.     This Complaint is brought pursuant to 28 U.S.C. §§2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

7.     An actual justiciable controversy exists between Walsh, on the one hand, and Lexington, RSUI, and Demtech, on the other hand, within the meaning of 28 U.S.C. §2201 regarding whether Lexington and RSUI are obligated in accordance with their respective insurance policies to indemnify and/or reimburse Walsh for costs it expended to rebuild and repair property damage done to support piers when Demtech performed a controlled demolition of the Long Island

Bridge that previously connected Long Island and Moon Island in Boston Harbor, as is more particularly described below.

8.　　This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the suit is between citizens or entities of different states.

9.　　Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), (c) and (d).

## THE DEMOLITION OF LONG ISLAND BRIDGE PROJECT

10.　　The Long Island Bridge (the "Bridge") was a sixteen span, approximately 3,450 foot-long steel truss structure that carried a two-lane road between Long Island and Moon Island in Boston Harbor.

11.　　The Bridge was supported by fourteen in-water piers ("Piers").

12.　　On October 8, 2014, the City of Boston ("City") closed the Bridge to pedestrian and vehicle traffic after an inspection found the Bridge unsafe for such traffic.

13.　　Thereafter, the City obtained permit approval from various federal, state and local agencies to demolish the Bridge.

14.　　The City, as awarding authority, entered into a written agreement with Walsh ("Contract"), as general contractor, pursuant to which Walsh agreed to furnish construction and construction related services for the project known as the Demolition of Long Island Bridge in Boston, Massachusetts (the "Project").

## THE CITY OF BOSTON / WALSH CONTRACT

15.　　On December 29, 2014, the City awarded Walsh the Contract to demolish the Bridge.

16.　　Describing Walsh's responsibilities with regard to the Project, the Contract, at Part 1, ¶8 of the Subsection entitled "Special Notice to Bidders" states:

* * *

> 8.     The Contractor shall assume responsibility for each three-span-
> continuous section or simple-span section of the bridge
> superstructure when work begins on that particular section. Once the
> Contractor assumes responsibility for a particular section, he shall
> retain full responsibility for that section until all contract work is
> complete.

17.     Article 1 of the Contract, located in Part 1, under the Subsection entitled "Contract"

states as follows:

> **The Contractor** has made his proposal from his own examinations and
> estimates, and shall not hold the City, its agents or employees, responsible
> for, or bound by, any schedule, estimate, sounding, boring, or any plan of
> any thereof; shall, if any error in any plan, drawing, specification, or
> direction relating to anything to be done under the contract comes to his
> knowledge, report it at once to the Commissioner; shall not, except as the
> Commissioner shall authorize in writing, assign or let any part of the
> contract or of anything to be done thereunder; shall, subject to the provisions
> of the contract, take all responsibility of and bear all losses resulting to him
> in carrying it on;. . . .

18.     Article 18 of the Contract, located in Part 1, under the Subsection entitled

"Contract", states as follows:

> All defective work shall be removed, repaired, or made good,
> notwithstanding that such work has previously been inspected and approved
> or estimated for payment. If the work or any part thereof shall be found
> defective at any time before the final acceptance of the whole work, the
> Contractor shall at his own expense make good such defect in a satisfactory
> manner.

> Any work done beyond the lines and grades shown on the plans or
> as given by the Commissioner or his assistants or any extra work done
> without written authority, shall be considered as unauthorized and at the
> expense of the Contractor. Such work will not be measured nor
> compensation allowed therefore. Work so done may be ordered removed at
> the Contractor's expense.

> Upon failure of the Contractor to remove and satisfactorily dispose
> of any or all defective of unauthorized work, and to remedy the same after
> being so notified, the Commissioner may cause such defective work to be
> remedied, removed, and replaced, and such unauthorized work to be

removed; and to deduct the costs therefore from any monies due or to become due the Contractor.

19.     Part 3 of the Contract, at the Subsection entitled "LOCATION AND GENERAL DESCRIPTION OF WORK," states, in part, as follows:

\* \* \*

The contractor shall remove all elements of the superstructure consisting of bridge deck, barriers, supporting structural members, trusses, bearings, joints, utilities, and leave in place the piers, abutments and other elements of the substructure without negatively affecting their present condition. Anchor bolts shall be burned off flush with embedment surfaces. It is anticipated that the replacement bridge will utilize the existing substructure elements; therefore, damage or other negative impacts to the substructure elements shall be avoided.

The contractor is solely responsible for determining the means and methods of safe bridge removal in its present condition without compromising safety and the stability of the structure during all stages of its removal and disposal. The contractor is solely responsible for carrying out this work in compliance with all applicable City of Boston, State and Federal laws and other requirements applicable to all aspects of the planned work.

Following this superstructure removal, the contractor shall leave the substructure in a permanently safe and sound condition. Any impacts to the existing piers shall be immediately and permanently repaired and sealed….

\* \* \*

20.     Part 4 of the Contract, at the Subsection entitled "SPECIAL PROVISIONS - DEMOLITION, ASSOCIATED UTILITY RELOCATION & GEOTECHNICAL BORINGS AT LONG ISLAND BRIDGE - CONTRACTOR'S OBLIGATIONS," states in part as follows:

The Contractor shall take all reasonable precautions and be solely responsible for the safety of, and shall provide protection to prevent damage, injury or loss to: . . . (b) the Work and materials and equipment to be incorporated therein; and (c) all other property on, adjacent to, or near the bridge site.

\* \* \*

The Contractor shall ensure that all of its activities and the activities of its employees, agents, officers and Subcontractors and all other Persons for whom the Contractor may be legally or contractually responsible are

undertaken in a manner that will minimize the effect on surrounding property and the public to the maximum extent practicable.

* * *

21. Part 4 of the Contract, at the Subsection entitled "SPECIAL PROVISIONS - DEMOLITION, ASSOCIATED UTILITY RELOCATION & GEOTECHNICAL BORINGS AT LONG ISLAND BRIDGE - PRE- AND POST-CONSTRUCTION VIDEO SURVEYS," states in part as follows:

> Prior to mobilization, the Contractor shall conduct a pre-construction audio-video survey of the entire Project work zone above mean high water (MHW), including the bridge (roadway surface, piers, trusses, abutments), for the purpose of establishing and recording of the existing conditions of all areas impacted by construction. Ground level photography shall consist of color video taping of surface features taken along the entire length of the project and including all work and storage areas and all intersecting roadways. Prior to audio-video taping of the project, all areas to be inventoried shall be investigated visually with notations made of items not readily visible by taping methods. One purpose of the color audio-video taping of the project is to provide the necessary information for restoration of surface features on Moon and Long Islands and at the bridge piers after completion of the project. The Contractor shall be responsible for repairing any damage or defect not documented as existing prior to construction. Coverage shall include, but not be limited to, all existing driveways, sidewalks, curbs, streets, signs, landscaping, trees, catch basins, fences, visible utilities and all buildings located within the zone of influence. Of particular concern are any existing faults, fractures, defects or other features. Audio description shall be made simultaneously with and support the video coverage. The audio-video survey delivered shall be DVD format in color.

> After the demolition of the bridge, the Contractor shall conduct a separate post-construction videotape survey of the remaining piers and abutments.

* * *

22. Part 4 of the Contract, at ITEM 015 – TEMPORARY FACILITIES AND CONTROLS, Section 1.13 REMOVAL OF UTILITIES, FACILITIES, AND CONTROLS, states in part as follows:

6

    A.      REMOVE TEMPORARY UTILITIES, EQUIPMENT, FACILITIES, AND MATERIALS BEFORE FINAL APPLICATION FOR PAYMENT INSPECTION.

    B.      REMOVE UNDERGROUND INSTALLATIONS TO MINIMUM DEPTH OF 2 FEET BELOW EXISTING GRADE.

    C.      CLEAN AND REPAIR DAMAGE CAUSED BY INSTALLATION OR USE OF TEMPORARY WORK.

    D.      RESTORE EXISTING FACILITIES USED DURING CONSTRUCTION TO ORIGINAL CONDITION, RESTORE PERMANENT FACILITIES USED DURING CONSTRUCTION TO SPECIFIED CONDITION. [Emphasis added].

* * *

23.    Part 4 of the Contract, at ITEM 115.01 PARTIAL BRIDGE DEMOLITION OF LONG ISLAND LUMP SUM BRIDGE OVER BOSTON HARBOR, PART 1 GENERAL, Section 1.01 DESCRIPTION, states in part as follows:

* * *

    E.      The Contractor shall assume responsibility for each three-span-continuous section or simple-span section of the bridge superstructure when work begins on that particular section. Once the Contractor assumes responsibility for a particular section, he shall retain full responsibility for that section until all contract work is complete….

* * *

    J.      Damage to any portion of the existing substructure designated to remain shall be repaired to match the condition prior to damage to the satisfaction of the Engineer at no additional cost.

## THE WALSH / DEMTECH SUBCONTRACT

24.    On or about February 9, 2015, in furtherance of its Contract with the City, Walsh, as general contractor, entered into a Subcontract Agreement ("Subcontract") with Demtech, as subcontractor.

25.     A copy of the Subcontract is attached hereto as Exhibit "A."

26.     Pursuant to the Subcontract, Demtech agreed to furnish and detonate explosives including, but not limited to, developing a demolition plan, supervising and directing the pre-burning of members to properly receive explosive materials, and performing the placement and detonation of explosive charges at bridge spans 2-10 and 12-14.

27.     Article 7.10 of the Subcontract states as follows:

> **7.10 Protection of the Work.** The Subcontractor shall take necessary precautions to properly protect the Subcontractor's Work and the work, property or materials of the Owner, the Contractor or other subcontractors from damage caused by the Subcontractor's operations. If the Subcontractor causes damage to the work or property of the Owner, the Contractor or other subcontractors, the Subcontractor shall promptly remedy such damage to the satisfaction of the Contractor, or the Contractor may so remedy and deduct the cost thereof plus reasonable overhead and profit from any amounts due or to become due the Subcontractor. The Subcontractor shall have primary responsibility and liability for any damages or losses which may be incurred.  Contractor may use Subcontractor's Work, at its option and at no additional costs.

28.     Article 10.1 of the Subcontract states as follows:

> **10.1 Subcontractor's Insurance.** Prior to the start of the Subcontractor's Work, the Subcontractor shall procure for the Subcontractor's Work and maintain in force Worker's Compensation and Employer's Liability Insurance, Automobile Liability Insurance, Commercial General Liability insurance and all insurance required of the Subcontractor under the Contract Documents. Evidence of required insurance shall be furnished to the Contractor prior to the commencement of the Subcontractor's Work.
>
> The Contractor (its parents, subsidiaries, and related entities), Owner and Architect/Engineer, and others as provided in the Contract Documents, shall be named as Additional Insured on each of these policies except for Worker's Compensation pursuant to an ISO form CG 2010 additional insured endorsement or any similar endorsement providing the same or broader coverage. Failure by the Contractor to request Subcontractor to fulfill this requirement is not a waiver of this requirement.  Subcontractor's insurance policies shall state that they are primary and not additional to, or contributing with, any other insurance carried by, or for the benefit of the Additional Insured.   Any such insurance maintained by an Additional Insured shall be excess of that maintained by Subcontractor. Each liability policy of Subcontractor shall contain a "separation of insureds" provision

stating that, except for limits of liability, the policies shall operate as though separate policies had been issued to each insured.

Subcontractor may provide the coverage required herein through the use of a primary liability policy or through a combination of primary liability and umbrella liability policies. However, the total limit of liability shall not be less than the limits set forth in the Contract Documents or greater if required by law.

Commercial General Liability Insurance shall include as minimum coverage: (i) Premises – Operations Liability; (ii) Products and Completed Operations Liability; (iii) Broad Form Property Damage Liability; (iv) Blanket Contractual covering indemnity obligations herein; (v) Personal Injury Liability, with Employment Exclusion deleted; (vi) Property Damage Liability Insurance shall provide "X, C, and U" (explosion, collapse, and underground hazard) coverage as applicable; (vii) Products and Completed Operations; and (viii) Cross-Liability Extension endorsement.

29.     Exhibit D to the Subcontract, subtitled "Insurance Requirements", states as follows:

**INSURANCE REQUIREMENTS:** Subcontractor shall provide and require its sub-subcontractors to provide insurance with the following minimum per occurrence limits.  Subcontractor shall provide insurance with minimum limits as listed in the column below that corresponds to their contract value, or those limits which are required of Subcontractors by the Owner in the contract between the Owner and Contractor, whichever are higher. Subcontractor policy limits, if greater, shall control over minimum limits required herein.   The limits required by this endorsement are minimum requirements, and the actual limits of any Policy that exceed these minimums shall be considered the required limits of this Exhibit. The following minimum requirement shall apply on a "Per Occurrence" basis, with an aggregate which shall apply at no less than twice the "per occurrence" limit of the policy, with the exception of the Professional Liability insurance (if applicable), wherein the requirement shall be remaining, uneroded limit required on a claims made form. If the Subcontract Value is greater than $5,000,000, the Subcontractor shall carry the limit which the owner requires of the Contractor, or the amount shown in the $1,000,000 to $5,000,000 column, whichever is greater.

30.     With Demtech receiving $539,685.06 for the Subcontract work on the Project, Demtech was required by Exhibit D of the Subcontract to provide a minimum of $3 million in "Commercial General Liability and Excess (combined)" coverage.

31.     Exhibit D to the Subcontract also required that the primary Commercial General

Liability Policy limit provided by Demtech be no less than $1 million.

32.     Exhibit D to the Subcontract further required:

> Subcontractor shall name and require its sub-subcontractors to name the following (and any parents, subsidiaries, and related entities) as Additional Insured on all policies of insurance, except Workers' Compensation and the Professional Liability Policy, with respect to liability arising out of Subcontractor's operations:

> **General Contractor: Walsh Construction Company (also Certificate Holder)**

> **Owner: CITY OF BOSTON**

> **Architect / Engineer: STV INCORPORATED**

> **Architect Engineer:   John M. Ennis**

33.     Exhibit D to the Subcontract also stated in regard to the Certificates of Insurance

that Demtech was required to procure:

> Certificate must state that coverage is primary and non-contributory with respect to any other insurance carried by any of the Additional Insureds. Additional insured endorsement shall be ISO CG 20 10 10 01, CG 20 33 10 01, or equivalent coverage, with no other endorsement relating to "Sole Negligence." Completed Operations coverage must be provided per ISO CG 20 37 10 01 or equivalent form.  Subcontractor shall be responsible for any deductible or self-insured retention with respect to coverage afforded Additional Insureds.  Any Self-Insured Retention shall be identified on the Certificate of Insurance, with the endorsement attached to the Certificate of Insurance.   Any Self-Insured Retention which applies to the Additional insured by the language of the endorsement or which disclaims any obligation of defense of a claim against an Additional Insured shall be considered a breach of these requirements, regardless of whether it is objected to by the Contractor, and failure to object by the Contractor or Owner shall not be considered a waiver of these requirements.  Subcontractor waives any and all rights of subrogation against the Additional Insureds. Subcontractor must provide 30 days written notice for any policy changes and/or cancellations.

## THE CERTIFICATE OF INSURANCE

34.     In accordance with the terms of the Subcontract, Demtech procured a Commercial General Liability Policy, numbered 066823676, from Lexington, with an effective period of May 1, 2014 to May 1, 2015, and a per occurrence limit of $1 million (the "Lexington Policy").

35.     Also in accordance with the terms of the Subcontract, Demtech procured a Commercial Excess Liability Policy, numbered NHA067545, from RSUI, with an effective period of May 1, 2014 to May 1, 2015, and a per occurrence limit of $1 million (the "RSUI Policy").

36.     On or about February 20, 2015, Demtech provided Walsh with a Certificate of Liability Insurance that set forth the policies that Demtech had procured per the requirements of the Subcontract.

37.     A copy of the Certificate of Liability Insurance that Demtech provided to Walsh for the Project is attached hereto as Exhibit "B.".

38.     The Certificate of Liability Insurance that Demtech provided to Walsh for the Project identified Walsh as the Certificate Holder and as "an additional insured for liability as required by written contract."

39.     The Certificate of Liability Insurance also indicated that the RSUI Policy procured by Demtech followed form over general liability.

## THE LEXINGTON POLICY

40.     A copy of the Lexington Policy is attached hereto as Exhibit "C".

41.     Coverage A of the Lexington Policy states as follows:

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.      Insuring Agreement**

**a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    (1)     The amount we will pay for damages is limited as described in SECTION III - LIMITS OF INSURANCE; and

    (2)     Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

**b.**     This insurance applies to "bodily injury" and "property damage" only if:

    (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2)     The "bodily injury" or "property damage" occurs during the policy period; and

    (3)     Prior to the policy period, no insured described in Paragraph 1 of SECTION II - WHO IS AN INSURED and no "employee" authorized by you to give or receive notice of an "occurrence", claim or "suit", knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the "policy period".

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of SECTION II. WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence" claim, or "suit", includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of SECTION II - WHO IS AN INSURED or any "employee" authorized by you to give or receive notice of an "occurrence", claim or "suit":

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services, loss of consortium or death resulting at any time from the "bodily injury".

42. Endorsement #009 to the Lexington Policy states as follows:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ADDITIONAL INSURED REQUIRED BY WRITTEN CONTRACT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY POLICY, COVERAGE APPLICABLE TO COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE (SECTION I - COVERAGES) ONLY

**A.** **Section II - Who Is An Insured** is amended to include any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period and executed prior to the "occurrence" of

the "bodily injury" or "property damage."

**B.**     The insurance provided to the above described A additional insured under this endorsement is limited as follows:

1.     COVERAGE A BODILY INJURY AND PROPERTY DAMAGE (Section I - Coverages) only.

2.     The person or organization is only an additional insured with respect to liability arising out of "your work" or "your product".

3.     In the event that the Limits of Insurance provided by this policy exceed the Limits of Insurance required by the written contract or written agreement, the insurance provided by this endorsement shall be limited to the Limits of Insurance required by the written contract or written agreement. This endorsement shall not increase the Limits of Insurance shown in the Declarations pertaining to the coverage provided herein.

4.     The insurance provided to such an additional insured does not apply to "bodily injury" or "property damage" arising out of an architect's, engineer's, or surveyor's rendering of or failure to render any professional services, including, but not limited to:

      i.     The preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

      ii.     Supervisory, inspection, architectural, or engineering activities.

5.     This insurance does not apply to "bodily injury" or "property damage" arising out of "your work" or "your product" included in the "product-completed operations hazard" unless you are required to provide such coverage by written contract or written agreement and then only for the period of time required by the written contract or written agreement and in no event beyond the expiration date of the policy.

6.     Any coverage provided by this endorsement to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis.

C.    In accordance with the terms and conditions of the policy and as more fully explained in the policy, as soon as practicable, each additional insured must give us prompt notice of any "occurrence" which may result in a claim, forward all legal papers to us, cooperate in the defense of any actions, and otherwise comply with all of the policy's terms and conditions. Failure to comply with this provision may, at our option, result in the claim or "suit" being denied.

## THE RSUI POLICY

43.    A copy of the RSUI Commercial Excess Liability Policy is attached hereto as Exhibit "D".

44.    Coverage under "Section I, Section 1" of the RSUI Policy, subtitled "Excess Liability Insurance" is amended and replaced by the "Pre-Existing Damage or Injury" Amendment to state as follows:

1.    **Insuring Agreement**

a.    We will pay those sums in excess of the limits shown in Item 6 of the Declarations, Schedule of Underlying Insurance, that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the "Underlying Insurance" also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.

b.    This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance", except:

(1)    We will have no obligation under this insurance with respect to any claim or suit that is settled without our consent;

(2)    With respect to any provisions to the contrary contained in this insurance;

(3)    This insurance applies to bodily injury and property damage only if:

(a)    The bodily injury or property damage is caused by an occurrence;

(b)    The outset of the bodily injury or property damage occurs during the policy period;

(c)     Such bodily injury or property damage did not result in damages which are the subject of any suit, settlement or adjustment prior to the inception date of this insurance (or the retroactive date of coverage under this insurance, if any, whichever is earlier; and

(d)     In the event the bodily injury or property damage results from continuous or repeated exposure to substantially the same general harmful conditions, then the:

       i.     Outset of the bodily injury or property damage was on or after the inception date of this insurance (or the retroactive date of any coverage under this insurance, if any, whichever is earlier); and

       ii.     Bodily injury or property damage was not actually, or alleged to have been, in progress prior to the inception date of this insurance (or the retroactive date of any coverage under this insurance, if any, whichever is earlier), even if the bodily injury or property damage continues during this policy period.

c.     If the outset of any bodily injury or property damage takes place during the policy period then it shall include any continuation of that bodily injury or property damage after the end of the policy period, but only to the extent that coverage is provided by the policies shown in the SCHEDULE OF UNDERLYING INSURANCE, for the full limits shown therein.

d.     Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

e.     This insurance applies to personal and advertising injury only if the personal and advertising injury is caused by an offense committed during the policy period.

f.     The amount we will pay for damages shall not exceed the Limits of Insurance stated in Item 4. of the Declarations.

g.      We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "Underlying Insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit. We may, at our discretion, investigate and settle any claim or suit. Our right and duty to defend end when the applicable limit shown in the Declarations has been used up by our payment of judgments or settlements.

## THE DAMAGE TO THE PIERS

45.     According to the City's plans for the replacement bridge, the Piers were supposed to remain intact so that they could support the new bridge.

46.     The Piers are owned by the City and do not come within the scope of the Contract Documents and Subcontract Work of Demtech.

47.     Demtech performed controlled detonations of the Bridge on March 23, 2015, April 1, 2015, and April 23, 2015, each of which caused steel debris from the imploding Bridge to fall into the harbor water.

48.     During the detonations of the Bridge, Demtech performed the detonations in a negligent manner and caused property damage to the underlying support Piers.

## THE CITY DEMANDS THAT WALSH
## REPAIR THE DAMAGED PIERS

49.     As a result of the property damage caused by Demtech's negligence in performing the detonations of the Bridge, the City directed Walsh to rebuild and/or repair the City's damaged Piers.

50.     As a result of the property damage to the Piers caused during Demtech's detonations of the Bridge, Walsh had a potential liability in tort to the City.

51.     In response to the City's direction, Walsh incurred costs and expenses of $1,909,564.68 to rebuild and repair the property damage to the Piers caused by Demtech's detonations.

## WALSH DEMANDS COVERAGE FROM LEXINGTON

52.     On May 21, 2015, Walsh made a demand upon Demtech and Lexington, in writing, to indemnify Walsh for the costs and expenses incurred to repair the property damage to the Piers caused by Demtech's detonations.

53.     The May 21, 2015 demand by Walsh upon Demtech and Lexington went unanswered.

54.     On October 25, 2016, Walsh made a written demand upon Lexington for a certified copy of the Lexington Policy.

55.     The October 25, 2016 demand by Walsh upon Lexington went unanswered.

56.     Walsh and/or its attorneys contacted Lexington on November 21, 2016, January 11, 2017, February 14, 2017, May 31, 2017, and June 1, 2017, and each time demanding that Lexington produce a certified copy of the Lexington Policy, and that Lexington respond to Walsh's requests for indemnification of the costs and expenses Walsh paid to repair the property damage to the Piers caused by Demtech.

57.     Walsh's November 21, 2016, January 11, 2017, February 14, 2017, and May 31, 2017 demands upon Lexington went unanswered.

58.     In response to Walsh's June 1, 2017 demand, on June 8, 2017, a Lexington representative contacted Walsh's attorney and stated that Lexington would be reviewing Walsh's claim in its entirety and addressing coverage.

59.     Walsh and/or its attorneys contacted Lexington again on November 27, 2019, December 27, 2019, and March 9, 2020 demanding that Lexington cover Walsh's requests for

indemnification of the costs and expenses Walsh paid to repair the property damage to the Piers caused by Demtech.

60.     By letter dated June 3, 2020 Lexington denied coverage to Walsh for Walsh's claim to coverage as an additional insured under the Lexington policy for indemnification of the costs Walsh paid to repair the property damage to the Piers.

## COUNT I – DECLARATORY JUDGMENT
### (AGAINST LEXINGTON)

61.     Walsh hereby incorporates and re-alleges the allegations set forth in Paragraphs 1 through 60 as if those allegations were set forth fully herein.

62.     There is a genuine and bona fide dispute and an actual controversy and disagreement between Walsh and Lexington regarding whether Lexington has a duty to indemnify Walsh for the costs and expenses Walsh incurred to repair the property damage to the Piers caused by Demtech.

63.     Article 10.1 of the Subcontract required Demtech to name Walsh as an additional insured on Demtech's Commercial General Liability Policy in accordance with the work Demtech was to do on the Project.

64.     Exhibit D to the Subcontract required Demtech to name Walsh as an additional insured on Demtech's Commercial General Liability Policy in accordance with the work Demtech was to perform on the Project.

65.     Exhibit D to the Subcontract further required that any Certificate of Insurance that Demtech might issue to demonstrate that it had named Walsh as an additional insured under its Commercial General Liability Policy needed to state that such coverage was primary and non-contributory with respect to any other insurance carried by Walsh.

66.     Demtech procured the Lexington Policy, which provides a per occurrence limit of $1 million.

67.     Demtech also provided Walsh with a Certificate of Liability Insurance that referenced Walsh's status as an additional insured under the Lexington Policy for the Project.

68.     The Certificate of Liability Insurance that Demtech provided to Walsh identifies Walsh as the Certificate Holder and as "an additional insured for liability as required by written contract."

69.     Per the terms of the Lexington Policy, on May 21, 2015 and thereafter, Walsh notified Lexington of the damage to the Piers caused by Demtech and the costs and expenses incurred to repair the Piers for the damage caused by Demtech.

70.     With Walsh's obligations as an additional insured under the Lexington General Liability Policy fulfilled, Lexington has failed to follow through on the reimbursement of Walsh that the Lexington Policy requires pursuant to Endorsement #009 to the Lexington Policy, Additional Insured Where Required By Contract.

71.     By failing to respond to Walsh's repeated requests for Lexington to review or respond to, or address coverage for, Walsh's claim for coverage as an additional insured under the Lexington Policy for indemnification of the costs and expenses Walsh incurred to repair the property damage to the Piers caused by Demtech, Lexington is estopped from denying coverage to Walsh and/or has waived the right to deny coverage to Walsh under the Lexington Policy.

WHEREFORE, Plaintiff WALSH CONSTRUCTION COMPANY respectfully requests that this Court, pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, find and declare as follows:

(A)     As the insurer that provided Commercial General Liability Policy, numbered 066823676, on a primary and non-contributory basis, to Demtech, as the named

insured, and to Walsh as an additional insured, with an effective period of May 1, 2014 to May 1, 2015, Lexington must reimburse Walsh for the costs and expenses Walsh incurred to repair the property damage to the Piers caused by Demtech;

(B)    Plaintiff is entitled to such additional relief as this Court deems just and equitable.

## COUNT II – BREACH OF CONTRACT
### (AGAINST LEXINGTON)

72.    Walsh hereby incorporates and re-alleges the allegations set forth in Paragraphs 1 through 71 as if those allegations were set forth fully herein.

73.    Walsh tendered the claim for damage to the Piers to Lexington based upon Walsh's status as an additional insured under Demtech's Lexington policy.

74.    Lexington has wrongfully denied coverage to Walsh in connection with the claim for the damaged Piers.

75.    By wrongfully denying coverage to Walsh for the claim for the damage to the Piers, Lexington has breached the insurance policy under which Walsh qualifies as an additional insured.

76.    Walsh performed all of its obligations under the Lexington policy.

77.    As a direct and proximate result of Lexington's breach of contract, Walsh has sustained damages in that its claim for indemnification under the Lexington policy for the damage to the Piers has been denied.

78.    Walsh is entitled to an award against Lexington for all of the damages it has incurred in connection with the damage to the Piers and in connection with Lexington's breach of the insurance policy.

WHEREFORE, Plaintiff WALSH CONSTRUCTION COMPANY respectfully prays for judgment in its favor and against Defendant, Lexington Insurance Company for all damages it incurs and has incurred in connection with the damage to the bridge Piers, including prejudgment and post-judgment interest in an amount in excess of the Court's $75,000 jurisdictional limit.

## COUNT III – DECLARATORY JUDGMENT
### (AGAINST RSUI)

79.     Walsh hereby incorporates and re-alleges the allegations set forth in Paragraphs 1 through 78 as if those allegations were set forth fully herein.

80.     There is a genuine and bona fide dispute and an actual controversy and disagreement between Walsh and RSUI regarding whether RSUI has a duty to indemnify Walsh under the terms of the RSUI Policy for the costs Walsh paid to repair the property damage to the Piers caused by Demtech.

81.     Article 10.1 of the Subcontract required Demtech to name Walsh as an additional insured on all insurance policies that Demtech, as the Subcontractor, was required to obtain in regard to the Project.

82.     Exhibit D to the Subcontract required Demtech to name Walsh as an additional insured on all insurance policies that Demtech, as the Subcontractor, was required to obtain in regard to the Project.

83.     Exhibit D of the Subcontract also required Demtech to provide a minimum of $3 million in "Commercial General Liability and Excess (combined)" coverage, no less than $1 million of which was required to be primary Commercial General Liability coverage.

84.     Exhibit D to the Subcontract further required that any Certificate of Insurance that Demtech might issue to demonstrate that it had named Walsh as an additional insured on its various policies needed to state that such coverage was primary and non-contributory with respect to any other insurance carried by Walsh.

85.     On or about February 20, 2015, Demtech provided Walsh with a Certificate of Liability Insurance that referenced Walsh's status as an additional insured under the RSUI Policy.

86.     Upon information and belief, RSUI is on notice of the costs and expenses Walsh incurred to repair the property damage to the Piers caused by Demtech.

87.     RSUI has failed to either take a coverage position relative to Walsh's claim for reimbursement of costs and expenses to repair the property damage to the Piers caused by Demtech, or to follow through on the reimbursement that the RSUI Policy requires.

WHEREFORE, Plaintiff WALSH CONSTRUCTION COMPANY respectfully requests that this Court, pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202, find and declare as follows:

(A)     As the insurer that provided an Excess Liability Policy, numbered NHA067545, to Demtech, as the named insured, and to Walsh as an additional insured, with an effective period of May 1, 2014 to May 1, 2015, RSUI must reimburse Walsh for the costs and expenses Walsh paid to repair the property damage to the Piers caused by Demtech; and

(B)     Plaintiff is entitled to such additional relief as this Court deems just and equitable.

## COUNT IV – VIOLATION OF MASS. GEN. L. C. 93A, § 11
## AND VIOLATION OF MASS. GEN. L. C. 176D, § 3
### (AGAINST LEXINGTON)

88.     Walsh hereby incorporates and re-alleges the allegations set forth in Paragraphs 1 through 78 as if those allegations were set forth fully herein.

89.     At all times relevant hereto, Lexington was engaged in trade or commerce within the Commonwealth of Massachusetts.

90.     At all times relevant hereto, Walsh was engaged in trade or commerce within the Commonwealth of Massachusetts.

91.     The conduct and transactions described herein occurred substantially within the Commonwealth of Massachusetts.

92.     On May 21, 2015, Walsh, as additional insured, furnished notice to Lexington concerning the property damage to the Piers.

93. Lexington has violated the following subsections of G.L. c.176D, §3(9) of the "Massachusetts Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance" Act by:

* * *

(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

* * *

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; and

* * *

(n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

94. Lexington's conduct was willful and knowing.

95. Lexington's conduct constitutes unfair or deceptive acts or practices in trade or commerce within the Commonwealth of Massachusetts.

96. Lexington's conduct constitutes unfair claims settlement practices within the Commonwealth of Massachusetts.

97. Walsh has been damaged as a result of Lexington's failure to respond to Walsh's repeated demands for reimbursement by having to pay the costs and expenses to repair property damage to the Piers caused by Lexington's named insured, Demtech plus attorneys' fees.

WHEREFORE, Plaintiff WALSH CONSTRUCTION COMPANY respectfully requests that this Court:

(A)     Find that Lexington's failure to respond to Walsh's repeated demands for reimbursement of the costs Walsh expended to repair the property damage that Demtech caused to the Piers constitute multiple violations of G.L. c.176D;

(B)     Pursuant to G.L. c. 93A, award Walsh the costs it expended to repair the property damage that Demtech caused to the Piers plus no less than double and no more than treble that amount, plus interest, costs and attorneys' fees;

(C)     Award prejudgment interest to Walsh with regard to the costs Walsh expended to repair the property damage that Demtech caused to the Piers;

(D)     Pursuant to G.L. c.176D, §7, award punitive damages to Walsh in an amount not to exceed 25% of the costs Walsh expended to repair the property damage that Demtech caused to the Piers;

(E)     Award Walsh its reasonable attorney's fees and costs for having to pursue Lexington for reimbursement of the costs that Walsh expended to repair the property damages that Demtech caused to the Piers; and

(F)     Provide such other and further relief as this Court deems just and equitable.


                                    WALSH CONSTRUCTION COMPANY
                                    By its attorneys,


Date: <u>August 4, 2020</u>                    <u>        /s/ Francis A. Shannon, III        </u>
                                    Francis A. Shannon, III, Esq.
                                    BBO # 560651
                                    fashannon@shannonlawassociates.com
                                    Steven Shane Smith, Esq.
                                    BBO # 630713
                                    sssmith@shannonlawassociates.com
                                    Shannon Law Associates, Inc.
                                    21 McGrath Highway, Unit 406
                                    Quincy, MA 02169
                                    (617) 479-1313

8306:017:complaint